GRANT HORNADAY *et al.* v. THE STATE OF KANSAS, *ex rel.*, *etc.*

**No. 11,716.** (62 Pac. 329.)

1. PARSONS INSANE ASYLUM— *Power of Legislative Committee.* Chapter 13 of the Laws of 1899, appropriating $100,000 for the erection of an insane asylum, for securing a site, and providing a manner of locating the same, does not authorize the legislative committee provided for in the act to do more than select a site consisting of 640 acres of land within three miles of the corporate limits of some city upon which the asylum shall be built. The committee was not vested with power to purchase or fix a price to be paid by the state for land deemed by it suitable as a location for such institution.

2. ———— *Purchase of Site—Power of State Board of Charities.* · The act above mentioned does not specifically point out how the state may obtain title to the lands selected by the committee

as a site for the asylum.  This omission is supplied by reference to chapter 46 of the Laws of 1881 (Gen. Stat. 1899, § 6336; Gen. Stat. 1897, ch. 68, § 18), conferring power upon the boards of trustees or managers of the several state institutions to commence and carry out condemnation proceedings to that end, and to section 15 of chapter 160 of the Laws of 1891 (Gen. Stat. 1897, ch. 5, § 15; Gen. Stat. 1899, § 6421), conferring like authority upon the state board of public works.

3. —————— *Purchase of Site—Duties of Certain State Boards.* It being the expressed intent of the legislature that the asylum be built upon a site determined upon by the committee, whose action in respect thereto is made final, and the selection having been made in the manner provided by law, it is the duty of the board of trustees of the institutions for the education of the blind, the deaf and dumb, and the asylums for the insane, or the state board of public works, to condemn, on behalf of the state, the land embraced in the site so chosen, under either one or the other of the acts mentioned in the above paragraph.

4. —————— *Jurisdiction.* This suit was properly begun and prosecuted in the district court by the county attorney of Clay county.

5. PRACTICE— *Transcript.* It is not necessary that a transcript which is made the basis of proceedings in error in this court be prepared by the clerk pursuant to an order of the trial court.

Error from Clay district court; W. S. GLASS, judge. Opinion filed October 6, 1900.  Affirmed.

*Kimball & Osgood, T. N. Sedgwick,* and *H. G. Webb,* for plaintiffs in error.

*J. H. Russell,* county attorney, and *Coleman & Williams,* for defendants in error.

The opinion of the court was delivered by

SMITH, J. :  This was a suit brought by the state of Kansas, on the relation of the county attorney of Clay county, against the board of trustees of the asylums for the insane, to enjoin the latter from accepting, on behalf of the state of Kansas, deeds conveying to the state certain lands near the city of Parsons, for the purpose of erecting an asylum for the insane thereon,

and from certifying to the state auditor any vouchers on which warrants might be issued on the state treasurer to pay the owners of said real estate the price of the same; and, further, to restrain said trustees from making any contract in the name or on behalf of the state of Kansas for the construction of buildings to be used as an insane asylum at or near the city of Parsons. Judgment was entered on the pleadings in the district court in favor of the state, and a perpetual injunction decreed in accordance with the prayer of the petition.

The facts, briefly stated, are as follows : Chapter 13 of the Laws of 1899, approved March 3 of the same year, is entitled :

"An act making an appropriation for the erection and equipment of an insane asylum at some place in the state of Kansas, providing a manner of locating the same, and for the purpose of securing a site, and providing for the management and maintenance of the same."

In the first section of the act the sum of $100,000 is appropriated for the purpose of securing a site and for building and equipping an insane asylum of the state. In section 2 it is provided that the asylum shall be located at some convenient, suitable and healthful point within three miles of the corporate limits of some city in the state of Kansas, the same to be selected by a legislative committee consisting of four members from the senate and five from the house. It is made the duty of this committee to visit various places in the state presenting desirable localities for the institution ; to consider carefully the geographical location with reference to population ; to ascertain whether there is an abundant water-supply, whether there are proper railway facilities, whether a suitable

site adapted to the needs of such an institution can be procured; and, after considering all the advantages and disadvantages, including cost of maintaining the institution, finally to proceed to determine such location by ballot. The act requires that the ground selected shall contain not less than 640 acres, that the action of said committee shall be final and conclusive, and that the asylum shall be declared to be located by the action of such committee, and the institution built pursuant to said act. It contains other provisions governing the construction of said institution.

The law further commits the matter of plans and specifications for the proposed asylum to the board of trustees of said charitable institutions, and requires that they shall agree upon a plan of erection, employ superintendents, have the exclusive superintendence and control over the erection of the buildings, and that, upon their completion, said board shall appoint a superintendent and such other help as is necessary, and at once open the institution for the receiving of insane patients. It authorizes the board of charities to certify accounts covering the cost of the buildings to the auditor of state, who is required to draw his warrant on the treasurer for the payment thereof.

Pursuant to this act a legislative committee was appointed, and on the 8th day of June, 1899, reported to the governor that it had selected a site for said asylum at a convenient, suitable and healthful point immediately joining the corporate limits of the city of Parsons, upon certain lands (describing them) containing 640 acres, more or less, for which said committee had agreed to pay the aggregate sum of $28,000. The board of trustees, plaintiffs in error, recognized the existence and assumed authority of said legislative committee, and received from the par-

ties with whom the committee had contracted for the
land upon which to erect said asylum deeds to the
same, and were, at the the time this suit was begun,
about to certify to the state auditor vouchers in favor
of the owners of the property, to the end that they
might be paid the agreed consideration therefor.

The important question to be decided is whether
this legislative committee was vested with power,
under the act above mentioned, to bargain for and fix
a price for the site of the proposed asylum which would
be obligatory on the said state board of trustees or
other state officer. It will be noticed that the appro-.
priation of $100,000 is made for the purpose, among
others, of *securing* a site. The legislative commtttee
is authorized to *select* the site, and further to deter-
mine "whether a suitable site, adapted to the needs of
such an institution, can be procured," and to deter-
mine such location by ballot. Subdivision 4 of section
2 reads:

"Such action of said committee shall be deemed
final and conclusive, and said asylum shall be de-
clared to be located by the action of a majority of such
committee, and said asylum shall be built pursuant to
the provisions of this act and of law governing the
construction of said institutions."

While the first section, following the language of the
title, appropriates money for the purpose of *securing* a
site, there is no manner expressly designated in the
law for the obtaining of it. The word "purchase" is
nowhere employed. As before stated, the purpose of
the committee's appointment was to select a site, and
its duties are expressly pointed out in subdivision 2
of section 2, which requires it to determine whether
a suitable site, adapted to the needs of such institu-
tion, *could be procured.*

It is contended by counsel for the state that the power of this committee was restricted to the selection of some city in the state of Kansas, within three miles of the corporate limits of which the asylum was to be located. We differ with them in their construction of the law. It reads : "Said asylum shall be located at some convenient, suitable and healthful point within three miles of the corporate limit of some city in the state of Kansas, the same to be selected in the following manner." The word *same* used in the last clause of the sentence clearly refers to the "healthful point within three miles of the corporate limit of some city," and not to the city itself..

Concerning all the sections of chapter 13 together, we are quite certain that the power and authority of this body was limited to the selection of a site for the institution, and that, having performed such duties, its decision is to be deemed final and conclusive, so far as a choice of sites is concerned ; but we can find nothing in the act which justifies the conclusion that such committee was empowered to bargain for or purchase the 640 acres of land thought by the legislature to be necessary upon which to build the institution. This conclusion is fortified by the fact that, five years after the passage of the law creating a board of trustees for the direction and control of the asylum for the blind, the asylum for the deaf and dumb, and the asylum for the insane, authority, theretofore withheld, was conferred upon the several boards of regents, directors, trustees and managers of said institution to exercise the right of eminent domain. This will be found in chapter 46 of the Laws of 1881 (Gen. Stat. 1899, § 6336 ; Gen. Stat. 1897, ch. 68, § 18), which reads :

"That for the purpose of acquiring lands on which to erect buildings or for laying and maintaining water-

mains, sewers, roads, or for any other purpose neces-
sary to properly maintain and carry on any state
institution or business thereof, the several boards of
regents, directors, trustees or managers of said state
institutions may proceed in the same manner as pro-
vided by law in the case of railroads for rights of way
and other purposes, said proceedings to be in the
name of the state of Kansas, by the chairman of the
board, or some one designated by the board or the
chairman thereof."

The act is entitled "An act to provide for condemn-
ing lands for state purpeses."

Power is expressly granted under this statute to the
plaintiffs in error, as trustees, to acquire lands on which
to erect buildings for such institution as is mentioned
in the act of 1899.    We can see no force in the argu-
ment that the act of 1881, above set out, restricts the
power of the trustees for the asylums for the insane to
the acquiring of lands to erect additional buildings
for the use of a state institution already established.
The first clause of the act is explicit, to the effect that
lands may be condemned by such trustees for the erec-
tion of buildings ; and the further grant of power to
the trustees, authorizing them to condemn land for
any purpose necessary to maintain properly and carry
on any state institution, is divided from that part of
the sentence immediately preceding it by the conjunc-
tion *or*, making it clear that there is no lack of au-
thority in the trustees to proceed to institute such
proceedings to secure title to lands desired for the
erection of buildings for a new institution.

Further than this, by section 15 of chapter 160 of
the Laws of 1891 (Gen. Stat. 1899, § 6421 ; Gen. Stat.
1897, ch. 5, § 15), the state board of public works (if
such a board exists) is also empowered to appropriate

and condemn such land as may be necessary for securing grounds for the construction of any state building.

We think that the legislature, when it passed the act of 1899, did so with the intention that the said power conferred on plaintiffs in error as a board of trustees, or on the board of public works, should be brought into exercise for the purpose of obtaining title to the site chosen, and that chapter 13 of the Laws of 1899 is to be coupled with chapter 46 of the Laws of 1881 (Gen. Stat. 1897, ch. 68, § 18; Gen. Stat. 1899, § 6336), and with section 6421 of the General Statutes of 1899 (Gen. Stat. 1897, ch. 5, § 15); and that the latter two should be considered with the former to give effect to the legislative intent.

After a careful consideration of the several sections of the act of 1899, we cannot conclude that this legislative committee was authorized to do more than to select and determine the land suitable for a site upon which the institution should be built, for ample provisions of law were at the time in force directing how such property might be secured for the state by the exercise of the right of eminent domain. There being a mode pointed out by law for the acquisition of the property desired, such method must be strictly pursued. There is nothing in the act of 1899 indicating that the committee was required to consider the price or value of the lands selected, a material matter when a purchase is contemplated. It was authorized to consider the cost of maintaining the institution, but not the cost of the site. Suppose that, after finding a location that fulfilled all the requirements, the owners refused to sell the land at any price, can it be said that the legislative direction that an asylum be built on the site chosen could be thus defeated, with statutes authorizing condemation in force? The contingency

mentioned leads strongly to the conclusion that it was
intended by the lawmakers that the site be procured
by resort to the sovereign power of eminent domain.
The rule is that, in the case of those acting on behalf
of the public, there is no power to agree as to the com-
pensation to be given to the landowner where his
property is sought to be taken for public use, unless
it is given by statute, either expressly or by implica-
tion. (Lewis, Em. Dom. § 288.)   Our view of the
meaning of that part of the act of 1899 relating to the
powers of the legislative committee and their limita-
tions makes it unnecessary to apply a doubtful or
strained construction to the law, and results in a har-
monious adjustment of legislative grants of authority,
free from complications, by which the purpose of the
legislature may be carried out.

Counsel for plaintiffs in error insist that the selec-
tion by the committee of the land mentioned as a site
for the asylum was in itself an exercise by the state
of its inherent power to appropriate private property
for a public purpose, and in such cases payment in
advance is not indispensable.   The facts before us do
not present a case where the state is attempting to
take land *in invitum*.   The right of this legislative
committee to buy from the landowners, and to obtain
title for the state in such manner, is the question at
issue.   It must be remembered that the state itself
in this action complains of a usurpation of power as-
sumed by the committee to purchase land—not of any
attempted authority to take land against the will of
the owner, for it has done nothing in that direction.
In *City of Enterprise v. Smith*, immediately preceding
(62 Pac. 324), it was held that an act of the legisla-
ture authorizing cities to purchase water-works con-
ferred no power on the municipality to acquire the

same by condemnation, and the well-settled rule of strict construction of such statutes was followed. Having determined that this legislative committee did not possess the power to purchase, its agreement to buy the lands which it had selected cannot be made effectual by defining such acts as an exercise of the right of eminent domain. Its assumed authority is not validated by giving another name to the method by which it sought to obtain title for the state.

It was within the power of the lawmakers themselves to designate a place where the institution should be built, but they chose to delegate this authority to a committee of their members, making the selection by the latter conclusive. Having chosen a site, the power of the committee was exhausted, and the duty then devolved upon the plaintiffs in error, or upon the state board of public works, under the statutes above cited, to institute condemnation proceedings, as in other cases, to determine the value of the property taken, to the end that title to the same be vested in the state.

The power of a county attorney to institute this action in the court below is denied by plaintiffs in error. The statute defining the duties of that officer is quite comprehensive. (Gen. Stat. 1899, § 1714; Gen. Stat. 1897, ch. 89, § 2.) It is his duty to prosecute or defend, on behalf of the state, all suits, applications, or motions, civil or criminal, arising under the laws of the state, in which the state or his county is a party or interested. In this case jurisdiction was obtained over the persons constituting the board of trustees of the asylums for the insane in Clay county, and the cause then being triable in that forum, the county attorney was authorized to prosecute it.

Plaintiffs in error have attached to their petition in

error in this court a transcript of the record, certified by the clerk to be such. A motion has been made to dismiss the proceedings here, for the reason that such transcript is not a transcript of the complete record which the court is authorized to have made, as provided by section 4679 of the General Statutes of 1899 (Gen. Stat. 1897, ch. 95, § 413). It is not necessary, for the purpose of review in this case, that the record be prepared in the trial court by its order, or signed by the presiding judge.

The judgment of the court below will be affirmed.